Ayesha N. Khan
Richard B. Katskee
Sara J. Rose
(motions for admission *pro hac vice* pending)
Heather L. Weaver (motion for admission to the Bar of this court pending)
AMERICANS UNITED FOR SEPARATION OF
    CHURCH AND STATE
518 C St., NE
Washington, DC  20002
Tel:    (202) 466-3234
Fax:    (202) 466-2587
*khan@au.org* / *katskee@au.org* / *rose@au.org* / *weaver@au.org*

Maurice A. Leiter (Bar No. 123732)
John Danos (Bar No. 210964)
ARNOLD & PORTER LLP
777 S. Figueroa St., 44th Floor
Los Angeles, CA  90017
Tel:    (213) 243-4000
Fax:    (213) 243-4199
*Maury_Leiter@aporter.com* / *John_Danos@aporter.com*

Attorneys for Plaintiffs
HURST et al.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KENNETH HURST, JOAN BALCOME, KIRK ROGER TINGBLAD, PHILIP JONES-THOMAS, BARRY S. GOLDBERG, SOPHIE GOLDBERG, JEANNIE PARENT, KEN and JODY VALMASSY, and ANN and RICHARD HOWARD, <br><br> *Plaintiffs,* <br><br> v. <br><br> STEVE NEWMAN, individually and in his official capacity as a member of the El Tejon Unified School District Board of Trustees; PAULA REGAN, individually and in her official capacity as a member of the El Tejon Unified School District Board of Trustees; STACEY GUSTAFSON, individually and in her official capacity as a member of the El Tejon Unified School District Board of Trustees; KITTY JO NELSON, individually and in her official capacity as a member of the El Tejon Unified School District Board of Trustees; PHYLLIS THROCKMORTON, individually and in her official capacity as a member of the El Tejon Unified School District Board of Trustees; JOHN WIGHT, individually | ) NO. _____ <br> ) <br> ) <br> ) <br> ) **PLAINTIFFS' MEMORANDUM OF** <br> ) **POINTS AND AUTHORITIES IN** <br> ) **SUPPORT OF MOTION FOR** <br> ) **TEMPORARY RESTRAINING ORDER** <br> ) **AND, IF NECESSARY, PRELIMINARY** <br> ) **INJUNCTION** <br> ) <br> ) DATE: <br> ) TIME: <br> ) COURT: |

and in his official capacity as superintendent of the El Tejon Unified School District; DAN PENNER, individually and in his official capacity as principal of Frazier Mountain High School; and SHARON LEMBURG, individually and in her official capacity as a teacher at Frazier Mountain High School,

     *Defendants.*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    The Course Description . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      C.    The Original Course Syllabus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      D.    The Revised Syllabus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      E.    The Concepts at Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      I.    The Plaintiffs Have Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      II.    The Standards for Issuing Preliminary Relief . . . . . . . . . . . . . . . . . . . . . . . 17

      III.    It Is Virtually Certain That the Plaintiffs Will Succeed in Establishing That the "Philosophy of Design" Course Is Unconstitutional . . . . . . . . . . . . . 19

            A.    The Establishment Clause Standards . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            B.    Efforts to Undermine Evolution or Advance Religious Theories About the Origins of Life Run Afoul of the Establishment Clause . . . 21

            C.    The "Philosophy of Design" Course Is Designed to Serve a Primarily Religious Purpose . . . . . . . . . . . . . . . . . . . . . . . 22

            D.    The Primary Effect of the "Philosophy of Design" Course Is to Promote Religion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                 1.    The Reasonable Observer Would View the Course As Promoting Religious Theories on the Origins of Life . . . . 23

                 2.    This Conclusion Does Not Change By the Expedient of Denominating the Course as Teaching "Philosophy" Rather than "Science" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      IV.    In the Event That the Court Elects to Conduct a Hearing, the Plaintiffs Seek Leave to Take Three Essential Depositions . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Agostini v. Felton*, 521 U.S. 203 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Alaska v. Native Village of Venetie*, 856 F.2d 1384 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . 17

*Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097 (9th Cir.1998) . . . . . . . . . . . . . . . . . . 17

*Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . 16

*City of South Pasadena v. Slater*, 56 F. Supp. 2d 1106 (C.D.Cal. 1999) . . . . . . . . . . . . . . . 18

*County of Allegheny v. ACLU*, 492 U.S. 573 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Crockett v. Sorenson*, 568 F. Supp. 1422 (C.D. Va. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . 18

*Daniel v. Waters*, 515 F.2d 485 (6th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Doe v. Human*, 725 F. Supp. 1499 (W.D. Ark. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 26

*Doe v. Porter*, 370 F.3d 558 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25

*Edwards v. Aguillard*, 482 U.S. 578 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Elrod v. Burns*, 427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Epperson v. Arkansas*, 393 U.S. 97 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21

*Freiler v. Tangipahoa Parish Bd. of Educ.*, 185 F.3d 337 (5th Cir. 1999) . . . . . . . . . . . . 21, 23

*Friends of the Earth v. Brinegar*, 518 F.2d 322 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . 18

*Gibson v. Lee County Sch. Bd.*, 1 F. Supp. 2d 1426 (M.D. Fla. 1998) . . . . . . . . . 16, 18, 19, 26

*Hall v. Bd. of Sch. Comm'rs*, 656 F.2d 999 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241 (D. Haw. 1999) . . . . . . . . 17

*Hawaii v. Gannett Pac. Corp.*, 203 F.3d 832 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Herdahl v. Pontotoc County Sch. Dist.*, 933 F. Supp. 582 (N.D. Miss. 1996) . . . . . . . . . . . . 26

*Herdahl v. Pontotoc County Sch. Dist.*, No. 3:94-188, 1996 WL 33373360
    (N.D. Miss. Feb. 22, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427 (9th Cir.1995) . . . . . . . . . . . . . . . . 17

*Joki v. Bd. of Educ.*, 745 F. Supp. 823 (N.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Kikumura v. Hurley*, 242 F.3d 950 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kitzmiller v. Dover Area School Dist.*, 400 F. Supp. 2d 707, 2005 WL 3465563,
    (M.D. Pa. December 20, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**TABLE OF AUTHORITIES**

**Pages(s)**

*L.A. Unified Sch. Dist. v. U.S. Dist. Ct.*, 650 F.2d 1004 (9th Cir. 1981) . . . . . . . . . . . . . . . . 17

*McCreary County v. ACLU of Kentucky*, 125 S. Ct. 2722 (2005) . . . . . . . . . . . . . . . . . . . . . . 19

*McLean v. Arkansas Bd. of Educ.*, 529 F. Supp. 1255 (E.D. Ark. 1982) . . . . . . . . . . . . . . 5, 21

*Mellen v. Bunting*, 327 F.3d 355, 370 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . 21

*Pollar v. Judson Steel Corp.*, No. 82-6833, 1984 WL 968 (N.D.Cal. Mar. 30, 1984) . . . . . . 18

*S.W. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914 (9th Cir. 2003) . . . . . . . . . . 17

*Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 17

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002) . . . . . . . . . . . . . . . . 18

*San Diego Comm. v. Governing Bd.*, 790 F.2d 1471 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . 18

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290  (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) . . . . . . . . . . . . . . . . . 17, 19

*SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir.1991) . . . . . . . . . . . . . . . . 18

*Sch. Dist. v. Ball*, 473 U.S. 373 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*School Dist. of Abington v. Schempp*, 374 U.S. 203 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Selman v. Cobb County Sch. Dist.*, 390 F. Supp. 2d 1286 (N.D. Ga. 2005) . . . . . . . . . . . 20, 21

*Webster v. New Lenox Sch. Dist. No. 122*, 917 F.2d 1004 (7th Cir. 1990) . . . . . . . . . . . . 21, 24

*Wiley v. Franklin*, 468 F. Supp. 133 (E.D. Tenn. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . 16, 26

**State Rules**

Federal Rule of Civil Procedure 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**INTRODUCTION**

In 1968, the Supreme Court held that it is unconstitutional to ban the teaching of evolution in public schools. *See Epperson v. Arkansas*, 393 U.S. 97 (1968). In 1987, the Court held that it is similarly unconstitutional to require public schools to teach creationism (in the form of so-called creation science) because it is an inherently religious view. *See Edwards v. Aguillard*, 482 U.S. 578 (1987). And just last month, a federal district court in Pennsylvania held that it is unconstitutional both to teach "intelligent design" (because that is just another form of creationism), and to disparage the scientific theory of evolution in order to advance a religious agenda. *See Kitzmiller v. Dover Area Sch. Dist.*, 400 F. Supp. 2d 707, 2005 WL 3465563, *6 (M.D. Pa. December 20, 2005). Indeed, time and time again the federal courts have proclaimed that advocacy on behalf of a creationist agenda has no place in the public schools.

Yet with the ink not yet dry on the *Kitzmiller* decision, and over the strenuous objections of the school's science teachers, the Board of Trustees and administrators of the El Tejon Unified School District decided to offer a course at Frazier Mountain High School, to begin two days later, that expressly advocates both creation science and intelligent design. What justification do they offer for their actions? They claim that, by the simple expedient of calling that course "philosophy" rather than "science," they can ignore the law.

Eleven parents believe that they, their children, and the rest of the Lebec, California, community, deserve better. They believe that parents, not school officials, should be the ones to decide what religious educations their children receive. So having first attempted expeditiously, both alone and through counsel, to persuade the district to mend its ways without litigation, but having been rebuffed, these parents now bring this § 1983 action to vindicate their fundamental constitutional rights. But alas, defendants have acted with even greater dispatch, and are already teaching the offending material. Accordingly, we now ask this Court to grant a temporary restraining order and, if necessary, a preliminary injunction, to stop defendants running roughshod over plaintiffs' First Amendment rights.

**FACTS**

**A.     The Parties**

The plaintiffs are parents of students at Frazier Mountain High School and state and local taxpayers.  Ex. 1, ¶¶ 1-2 and Ex. 2, ¶¶ 1-2.  Plaintiffs bring this Section 1983 action against the members of the Board of Trustees of the El Tejon Unified School District and various school-district officers and employees for violating their rights under the First and Fourteenth Amendments to the U.S. Constitution.

Individual defendants Steve Newman, Paula Regan, Stacey Gustafson, Kitty Jo Nelson, and Phyllis Throckmorton are members of the El Tejon Unified School District Board of Trustees. Defendant John Wight is the Superintendent of the school district.  Defendant Dan Penner is the principal of Frazier Mountain High School.  And defendant Sharon Lemburg is a special-education teacher and instructor for the "Philosophy of Design" course at Frazier Mountain High School. The defendants are sued in their individual capacities for nominal damages and in their official capacities in all other respects.

**B.     The Course Description**

The Frazier Mountain High School conducts three academic sessions per year:  a fall semester, a winter intersession, and a winter/spring semester.  The intersession is a month-long academic session during which students are required to take remedial classes, or if they do not need any remedial classes, to take elective courses.  Rather than a typical seven-period school day, the students attend two three-hour-long classes per day during the intersession period.

On December 1, 2005, students at Frazier Mountain High School were given, and told to share with their parents, the course descriptions for the upcoming intersession, to run from January 3, 2006 through February 3, 2006.[1]  Among the available courses was "Philosophy of Intelligent Design," which was described as follows:

> The class will take a close look at evolution as a theory and will discuss the scientific, biological, and Biblical aspects that suggest why Darwin's philosophy is not rock solid.  This class will discuss Intelligent Design as an alternative response to evolution.  Topics that will be covered are the age of the earth, a world

---

[1]     According to the website for the Frazier Mountain High School, the intersession period ends on February 3.  In contrast, the letter sent to plaintiffs' counsel by defendant Wight states that the Philosophy of Design course is scheduled to end on January 20.  *See* Ex.3, Att. B.

> wide flood, dinosaurs, pre-human fossils, dating methods, DNA, radioisotopes, and geological evidence. Physical and chemical evidence will be presented suggesting the earth is thousands of years old, not billions. The class will include lecture discussions, guest speaker, and videos. The class grade will be based on a position paper in which students will support or refute the theory of evolution.

Ex. 1, ¶ 19, Att. A. This description evinces a plainly pro-creationism, anti-evolution perspective. It does so in three ways. First, it explicitly advocates the view that Darwin's theory of evolution is a philosophy that suffers from scientific and Biblical defects. Second, the references to "the age of the earth, a world wide flood, dinosaurs, pre-human fossils, dating methods, DNA, radioisotopes, and geological evidence" bespeak a plainly religious perspective. Finally, the course description's promise to present evidence "suggesting that the earth is thousands of years old, not billions," reflects a religious belief peculiar to young-earth creationists. Ex. 4, ¶ 80.

Later the same day, December 1, plaintiff Dr. Hurst spoke to Mrs. Lemburg over the telephone to object to the intelligent-design course offering. Ex. 1, ¶ 24. During their conversation, Mrs. Lemburg repeatedly referred to "intelligent design" as "creationism." She also informed Dr. Hurst that the original title of the course had been "Creationism vs. Evolution." Ex. 1, ¶ 25. Furthermore, although the proposed syllabus stated that the course would cover complicated scientific topics, such as the laws of thermodynamics and the fossil record and dating methods, Dr. Hurst concluded from the conversation that Mrs. Lemburg had no knowledge of these or other scientific subjects. Ex. 1, ¶ 26. By the end of the conversation, it was clear to Dr. Hurst that Mrs. Lemburg planned to use the class to advocate against evolution and in favor of the religious beliefs of intelligent design and creationism. Ex. 1, ¶ 28.

The course description — with its promise to advance the view that "Darwin's philosophy is not rock solid" and to present evidence "the earth is thousands of years old, not billions" — has never been modified or withdrawn. *See* Ex. 1, ¶ 19, Att. A.

### C. The Original Course Syllabus

A syllabus for the course was written by the course instructor, Sharon Lemburg, a special-education teacher who holds a bachelor-of-arts degree in physical education and social science with an emphasis in special education and sociology. *See* El Tejon Unified School District, http://falcon.el-tejon.k12.ca.us (follow "staff" hyperlink) (last visited Jan. 9, 2006). She is the wife of the minister for the local Assembly of God church (a Christian fundamentalist church) and a

proponent of a creationist world-view. She informed the local newspaper, the *Mountain Enterprise*, "Everything happened quickly, I had to have a syllabus overnight. I'm not an expert of this subject." She added that she just wanted "to tell people about the ideas of intelligent design."

The syllabus proposed five subject areas to be covered by the month-long course: "What is Philosophy?," "What is Intelligent Design," "What is Darwinism/Evolution?," "Laws of Thermodynamics," and "Fossil Records and Dating Methods." The syllabus purports to call for the balanced presentation of pro- and anti-evolution perspectives, but it is plainly slanted in favor of the latter. This is reflected in several ways. First, the segment "What is Intelligent Design?" asks questions that reflect a strong pro-intelligent-design bias, such as "Why is it a movement?"; "Why is it gaining momentum?"; and "Why is it so threatening to society?" Ex. 1, Att. B.

Second, in the fourth and fifth phases of the course, Mrs. Lemburg, who has no scientific background, planned to discuss the "laws of Thermodynamics" and "Fossil Records and Dating Methods." Ex. 1, Att. B. These are two of the subject areas that creationists are well-known to favor in mounting attacks on the scientific theory of evolution. Ex. 4, ¶ 83.

Finally, Mrs. Lemburg listed on the original syllabus 24 videos to be potentially shown to to students during class. Ex. 1, Att. B. Of the 24 listed titles, 23 are produced or distributed by religious organizations and assume a pro-creationist, anti-evolution stance.[2] The list consisted of the following:

*1.      "Creation/Evolution: Does it Matter What We Believe?"*

According to online purveyor of this DVD, the Institute for Creation Research ("ICR"), this DVD provides "Biblical and scientific reasons why we should not compromise God's Word with evolution, including: Biblical and scientific evidences for a worldwide flood; A look at the days of creation and why the context, grammar, and genealogies support literal days; A comparison of creation and evolution with scientific laws; Why it matters what we believe and the cost of

---

[2]      The sole exception is "The Fire Below Us: Remembering Mount St. Helens." *See infra* ¶ k.

compromise."  Institute for Creation Research, http://www.icr.org/store (last visited January 9, 2006).[3]

*2.      "Dating Fossils and Rocks"*

According to ICR, which sells this DVD online, "Dating Fossils and Rocks" is  "[o]ne of a set of six educational DVDs that will teach and prepare you to challenge evolution.  Each DVD contains a full one-hour lecture plus interviews with scientists and Biblical scholars."  Institute for Creation Research, http://www.icr.org/store (last visited January 9, 2006).

*3.      "The Origin of Life: Scientific Evidence that Demands a Creator God"*

According to the website of Mike Riddle, a professor at ICR, the purpose of this DVD is to "demonstrate that evolution does not have an answer for how life originated and that the scientific evidence points to a Creator God."  Train to Equip, http://www.train2equip.com/DVDlessonPlan.asp (last visited Jan. 9, 2006).

*4.      "The Fossil Record"*

According to Riddle's website, the purpose of this DVD is to "demonstrate that the fossil record supports the Biblical model which says that creatures were created after their kind and did not evolve through a series of slow, gradual processes."  Train to Equip, http://www.train2equip.com/DVDlessonPlan.asp (last visited Jan. 9, 2006).

*5.      "Astronomy and the Bible"*

According to Riddle's website, the purpose of this DVD is "to demonstrate that only selected evidence is being presented to the public and that there are many scientific evidences that refute the evolution claims of the big bang, billions of years, and star formation by natural processes. There are many scientists that believe in a young solar system and universe because of the scientific evidence and the most logical explanation is there has to be a Creator God who created just as His Word states — in six days."  Train to Equip, http://www.train2equip.com/DVDlessonPlan.asp (last visited Jan. 9, 2006).

---

[3/]     The court in *McLean* identified the ICR as "[p]erhaps the leading creationist organization" and "the leading publisher of creation science material."  *See McLean*, 529 F. Supp. 1255, 1259 (E.D. Ark. 1982).

*6.       "Lucy, She's no Lady!"*

According to ICR, this video seeks to refute the existence of a "missing link" between monkeys and humans." Institute for Creation Research, http://www.icr.org/store (last visited Jan. 9, 2006). According to Family Pass Online, which describes itself as "the leading family friendly online media subscription service delivering quality entertainment, learning and inspirational products for today's faith-based consumer," the video will leave the viewer "convinced that the origin of humans is best explained by the One who was there at the beginning, the Creator God." Family Pass Online, http://www.kidflix.com (last visited on Jan. 9, 2006).

*7.       "From a Frog to a Prince"*

According to ICR, this video demonstrates  that "a kiss from a princess can't turn a frog into a prince yet evolutionists claim that ancestral amphibians did change into people just by chance and natural selection," and includes refutations of evolutionary theory by various scientists. Institute for Creation Research, http://www.icr.org/store (last visited Jan. 9, 2006).

*8.       "Chemicals to Living Cells: Fantasy or Science?"*

Sold online by Answers in Genesis, a self-described Christian ministry "that seeks to share the truths of God's Word from the very first verse," this video illustrates why "'Goo-to-you' evolution is impossible . . . The laws of real chemistry prevent non-living chemicals from becoming living cells."    About Answers in Genesis, http://www.answersingenesis.org/getstarted.aspx (last visited Jan. 9, 2006).

*9.       "Unlocking the Mysteries of Life: The Scientific Case for Intelligent Design"*

This video was produced by Illustra Media, which is a division of the Christian film company Discovery Media Productions.  In Illustra Media's own words, this video asks:

> Is life on Earth the product of purely undirected processes like time, chance and natural selection? Or, can the origin and diversity of living organisms be traced to an intelligent cause? Unlocking the Mystery of Life explores these timeless questions and presents compelling evidence to support an idea that could revolutionize scientific thought — the theory of intelligent design.

Illustra Media, http://www.illustramedia.com/umolinfo.htm (last visited Jan. 9, 2006).

*10.       "Mt. Saint Helens: Explosive Evidence for Catastrophe"*

According to the Northwest Creation Network (NCN), which sells this video online, "[g]eologist Steve Austin, Ph.D. shares the exciting results of his explorations on Mount St. Helens

and its adjacent Spirit Lake.  You will view spectacular and unique photography of the volcano and its after-effects.  Along with thousands of other scientists and educated professionals, Dr. Austin is convinced that the Biblical Flood is reliable and is vital to a true understanding of history, its purpose, and destiny."  Northwest Creation Network, http://www.nwcreation.net/ (last visited Jan. 9, 2006).

11.     *"The Fire Below Us:  Remembering Mount St. Helens"*

This DVD, produced by Global Net Productions, is the only video listed on the original syllabus that does not advocate expressly for intelligent-design or young-earth creationism. However, the video is about volcanic activity and appears to take neither a pro-creationist nor a pro-evolution perspective. Global Net Productions, http://www.globalnetproductions.com (last visited Jan. 9, 2006).  It is thus unclear why Mrs. Lemburg included this video on the list.

12.     *"The Grand Canyon Catastrophe: New Evidence of the Genesis Flood"*

According to ICR, which sells this video online, the video  "explores the 'breached dam'" theory that catastrophic drainage of vast post-Flood lakes may have carved the Grand Canyon rapidly and recently. Proof that similar canyons were formed rapidly at Mt. St. Helens and Grand Coulee challenges conventional geology. Vivid images bring alive Native American legends that catastrophic floods shaped the amazing stone sculptures of the Canyonlands, and new evidence supports the biblical account of a recent global Flood."  Institute for Creation Research, http://www.icr.org/store (last visited Jan. 9, 2006).

13.     *"Grand Canyon: Monument to Catastrophe"*

Plaintiffs could find no video titled "Grand Canyon: Monument to Catastrophe." However, plaintiffs did find a video titled "Grand Canyon: Monument to the Flood."  NCN's description of that video states, "The Grand Canyon is one of the most beautiful and intriguing natural wonders in the world.  Millions crowd to its rim every year.  But if the story that they are told about its formation is true, then the Bible must be false . . . .  In this compelling documentary five creationist geologists interpret Grand Canyon and Colorado Plateau."  Northwest Creation Network, http://www.nwcreation.net (last visited Jan. 9, 2006).

*14.    "Thousands . . . Not Billions"*

According to ICR, which sells this DVD online, the video is "the ultimate multimedia resource for any family, student or teacher's library.  Evolution and modern science has questioned the Biblical account of Creation for years, and now compelling new scientific research by ICR challenges modern science and their dating techniques.  How do we know how old the earth is? Does science confirm what Scripture tells us already?  Loaded with detailed animations, illustrations and photos, this documentary summarizes the findings and amazing discoveries of the Radioisotopes and the Age of the Earth (RATE) Project at the Institute for Creation Research." Institute for Creation Research, http://www.icr.org/store (last visited Jan. 9, 2006).

*15.    "Life's Story"*

According to ICR, which sells this DVD online, this video demonstrates that "The story of life itself refutes evolution. Genetic research continues to cast increasing doubt on the possibility of evolution actually occurring.   Fish, dolphins, giraffes, and multiple other animal[s] dispute evolution simply by eating and breathing!  A fortifying experience for both your faith and your intellect."  Institute for Creation Research, http://www.icr.org (last visited Jan. 9, 2006).

*16.    "The Privileged Planet"*

According to NCN, which sells this video online, the video seeks to challenge the view "common among scientists and intellectuals, that our Earthly existence is not only rather ordinary, but in fact, insignificant and purposeless."  Northwest Creation Network, http://www.nwcreation. net/ (last visited Jan. 9, 2006).

*17.    "Rocks of Ages or Rocks of Creation?"*

According to ICR, which sells this DVD online, the video queries: "Are earth's rocks millions of years old? RATE, a creationist research project, finds exciting evidence that earth's rocks may only be thousands of years old."   Institute for Creation Research, http://www.icr.org/store (last visited Jan. 9, 2006).

*18.    "Radioisotopes and the Age of the Earth"*

According to ICR, which sells this DVD online, the video explains how "the principles, methods, and data from radioisotopes . . . illustrate conflicting ideas on the age of the earth. The

young earth framework of the Bible interprets radioisotopes in rocks, especially Grand Canyon." Institute for Creation Research, http://www.icr.org/store (last visited Jan. 9, 2006).

*19.     "Experiments in Stratification"*

According to ICR, which sells this video online, "The geological time-scale is shown . . . to have been constructed on invalid data . . . .  [T]he video explains how this fundamental error in calculating geological time was discovered." Institute for Creation Research, http://www.icr.org/store (last visited Jan. 9, 2006).

*20.     "Icons of Evolution"*

According to ICR, which sells the video online, this video asks: "Are students learning the whole truth about Darwin's theory of evolution? According to a growing number of scientists, the surprising answer is no.  They claim that many of the most famous 'Icons of Evolution' — including Darwin's 'Tree of Life,' finches from the Galapagos Islands, and embryos that look remarkably similar — are based on outdated research and sloppy logic.  They say students are being hurt by the failure to present both sides of an emerging scientific debate over Darwin's theory.  Come explore this fascinating new conflict over evolution in the classroom — a conflict based on science, not religion.  Learn about the controversy that engulfs one town when a teacher actually tries to tell students that some scientists disagree with Darwin."  Institute for Creation Research, http://www.icr.org/store (last visited Jan. 9, 2006).

*21.     "War of the Worldviews: Creation vs. Evolution"*

According to ICR, which sells this video online, the video asks: "Is there a battle plan or strategy we need to be implementing? This thought-provoking video takes you on a quick tour of history, documenting the influences that have brought about the changes we now face. It gives Christians a clarion call to be armed, to stand firm, and never give up hope."  Institute for Creation Research, http://www.icr.org/store (last visited Jan. 9, 2006).

*22.     "In the Beginning"*

According to ICR, which sells this video online, the video asks: "How did the Genesis Flood happen? A radical new super-computer model of catastrophic plate tectonics, developed by Dr. John Baumgardner at Los Alamos National Laboratory shows how runaway thermal subduction may have caused the breakup and flooding of Pangea, the early supercontinent.  Dr.

Mem. Supp. Pls.' Mot. for TRO

Baumgardner is one of a group of six creation scientists [who] combine a wide range of specializations to show that the evidence does support the Genesis account of origins." Institute for Creation Research, http://www.icr.org/store (last visited Jan. 9, 2006).

23.    *"Evidences: The Record and the Flood"*

According to ICR, which sells this video online, the video is "[a] professionally produced program containing animation to help Christians understand how layers, such as the layers of rock at the Grand Canyon, could have formed quickly and not slowly over millions of years." Institute for Creation Research, http://www.icr.org/store (last visited Jan. 9, 2006).

24.    *"Geologic Evidences"*

According to ICR, which sells this video online, "[s]trata of Grand Canyon document the inside story to the history of the ground beneath our feet. Strata, fossils, faults, erosion, and volcanoes reveal the catastrophic Flood of Noah's day at Grand Canyon." Institute for Creation Research, http://www.icr.org/store (last visited Jan. 9, 2006).

In addition to the list of videos, the original syllabus provided a list of speakers who purportedly were invited to address the class. The only two proposed speakers who would support evolution were Dr. Hurst and "Francis Krich." Ex. 1, ¶ 35. Dr. Hurst never agreed to speak before the class and, indeed, had declined the invitation because of his concerns about the course. "Francis Krich" (who was revealed to be Nobel Prize winner Francis Crick, the co-discoverer of the double helix structure of DNA) could not have agreed to speak either, as he died in June 2004.

The remaining proposed speakers are all vocal advocates of intelligent design. Ex. 4, ¶ 84. Joseph W. Francis and Ross Anderson are professors at The Master's College, a fundamentalist Christian college in Santa Clarita, California, that "teach[es] the literal, grammatical-historical interpretation of Scripture which affirms the belief that the opening chapters of Genesis present creation in six literal days." The Master's College, http://www.masters.edu/DeptPageNew.asp?PageID=61 (last visited Jan. 9, 2006). According to the Access Research Network, an intelligent-design advocacy organization, Mr. Francis "has published numerous scientific articles in medical, biological and creation journals and a booklet entitled The Biblical Basis for the Sanctity of Life and Inviolability of Man. . . . His research interests include scientific creationism . . . ." Access Research Network,

http://www.arn.org/arnproducts/videos/v052.htm (last visited Jan. 9, 2006). "David Kopich" is most likely David Coppedge, who operates the website "Darwinisdead.org" (last visited Jan. 9, 2006) and a group called Creation Safari, which is associated with the Bible-Science Association. Creation Safari, http://creationsafaris.com (last visited Jan. 9, 2006).

### D.    The Revised Syllabus

On January 1, 2006, New Year's day, the Board of Trustees called a special meeting. Notice to the public was provided only twenty-four hours earlier. The sole item on the public agenda was the "Consideration of Intercession Curriculum Courses at Frazier Mountain High School." Patric Hedlund, *Intelligent Design Syllabus Spurs School Board into Special Holiday Meeting*, THE MOUNTAIN ENTERPRISE, Jan. 6, 2006, *available at* http://www.mountainenterprise.com/ IntellDesign-stories/060106-holiday_mtg.html.

At this meeting, the Board of Trustees and other attendees were presented with a revised syllabus (dated December 29, 2005) for the class — now denominated "Philosophy of Design" — which Superintendent Wight characterized as "balanced" and a "good class." Ex. 1, ¶ 37, Att. C. Wight also informed the school board that he had consulted with the school district's attorneys, who had told him that as long as the course was called "philosophy," the district could, if it wanted, present even an unbalanced class entirely about intelligent design. *See* Erin Waldner, *'Intelligent Design' set for class session*, BAKERSFIELD CALIFORNIAN, Jan. 2, 2006, at B1.

The revised syllabus eliminates the fourth and fifth phases of the course (on thermodynamics as well as the fossil record and dating methods). Instead, it identifies four phases: "What is Philosophy?"; "What is the Theory of Evolution/Darwinism?"; "What is Intelligent Design/Creationism?"; and "Philosophies Concerning Origins." Ex. 1, Att. C. The segment on "What is Intelligent Design/Creationism?" retains questions reflecting a pro-intelligent-design/creationism perspective, including "Why [sic] is this movement and why is it gaining momentum?" and "Why is it so threatening to society, the educational system, and evolutionists?" This last question, which posits a cultural conflict between creationism and "society," is plainly an example of Christian apologetics. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 101 (1986) (defining apologetics as branch of theology devoted to defense of religious faith, especially Christian faith, from criticism originating from outside that faith).

The revised syllabus included a revised video list.  Some of the videos on the original syllabus remained — namely "Unlocking the Mysteries of Life: The Scientific Case for Intelligent Design," "Icons of Evolution: The Growing Scientific Controversy over Darwin," and "Chemicals to Living Cells: Fantasy or Science?" — but most of the videos advocating young-earth creationism were replaced by videos advocating intelligent design.  The new videos were as follows:

*1.*     *"Where Does the Evidence Lead?  Exploring the Theory of Intelligent Design"*

This video, produced by Illustra Media, presents the entire content of "Unlocking the Mystery of Life" in a segmented educational format.  Illustra Media describes the video as "examin[ing] Darwinian evolution and present[ing] a powerful challenge to its validity — the theory of intelligent design."  Illustra Media, http://www.illustramedia.com/wdtelinfo.htm (last visited Jan. 10, 2006).

*2.*     *"Focus on the Origin of Life: An Interview with Dean H. Kenyon"*

According to the Access Research Network, which produces this video, "[i]n this thought provoking interview Professor Kenyon discusses the many problems in current origin-of-life theories which have led him to conclude that life is not the result of undirected chemical processes." Access Research Network, http://www.arn.org/arnproducts/vidinfo.htm (last visited Jan. 9, 2006).  Dean Kenyon was the expert witness who advocated creation science in *Edwards v. Aguillard*.  After the Supreme Court held that it was unconstitutional to teach creation science in public schools, Kenyon took the creationist text he was writing and substituted the term "intelligent design" for the terms "creationism" and "creation science," issuing the book as the intelligent-design text *Of Pandas and People*.  *See* PERCIVAL DAVIS & DEAN H. KENYON, OF PANDAS AND PEOPLE (1993).  That book was at the center of the controversy in *Kitzmiller*, 2005 WL 3465563 (holding that school district's policy adding intelligent design to public-school science curriculum violated Establishment Clause).

*3.*     *"Focus on the Origin of Life: An Interview with Dr. Charles Thaxton"*

According to the Access Research Network, which produces this video, "[i]n this exclusive interview, Dr. Charles Thaxton challenges the assumption that time, chance, and natural processes are sufficient to explain the origin of life."       Acccess     Research     Network,

http://www.arn.org/arnproducts/vidinfo.htm (last visited Jan. 9, 2006).  Thaxton is the academic editor of the book *Of Pandas and People*.  *See* PERCIVAL DAVIS & DEAN H. KENYON, OF PANDAS AND PEOPLE (1993).

*4.      "The Theological Roots of Modern Science: Dr. Henry F. Schaefer"*

In this video, according to its producer the Access Research Network, "Dr. Henry Schaefer . . . confronts the assertion that one cannot believe in God and be a credible scientist.  He starts by showing that the theistic worldview of Bacon, Kepler, Pascal, Boyle, Newton, Faraday and Maxwell was instrumental in the rise of modern science. He goes on to name many modern scientists and Nobel prize winners, including Charles Coulson, John Suppe, Charles Townes, Arther Schawlow, Alan Sandage, Donald Page, R. David Cole and Francis Collins, whose religious faith is an integral part of who they are as scientists. The video concludes with an exclusive interview with Dr. Schaefer where he discusses why a Christian worldview is more compatible with the findings of modern cosmology than a purely naturalistic and materialistic worldview." Access Research Network, http://www.arn.org/arnproducts/vidinfo.htm (last visited Jan. 9, 2006).

*5.      "Focus on Origins Series: How Darwinists Think"*

According to the Access Research Network, which produces this video-taped interview with Phillip Johnson, "Johnson [ ] shows how supposed evidence for evolution has fallen into question and other concerns have arisen so that the triumphalism of 1959 has been reversed and the Darwinists are now on the defensive." Access Research Network, http://www.arn.org/arnproducts/vidinfo.htm (last visited Jan. 9, 2006).  "Phillip Johnson, considered to be the father of the [intelligent-design movement], . . . has written that 'theistic realism' or 'mere creation' are defining concepts of [intelligent design].  This means 'that God is objectively real as Creator and recorded in the biological evidence . . . .'" *Kitzmiller*, 2005 WL 3465563, at *11.  He has complained that the "Darwinian theory of evolution contradicts not just the Book of Genesis, but every word in the Bible from beginning to end," and has posited the first verse of the New Testament Book of John ("In the Beginning was the Word, and the Word was God.") as the textual source for intelligent design.  *Id.*

6.      *"Focus on Origins Series: Raising Questions About Evolution in the Schools"*

According to the Access Research Network, which produces this video, "[i]n this thought-provoking lecture, Johnson describes the Santorum resolution and how it is intended to open up education, so that evidence both for and against evolution can be taught. . . .  He also considers why the major science organizations are so upset at the idea that intellectual freedom might be extended to this subject."   Access Research Network, http://www.arn.org/arnproducts/vidinfo.htm (last visited Jan. 9, 2006).

7.      *"A Critique of Darwinist Icons: Lecture and Interview With John Wells"*

According to the Access Research Network, which produces this video**,** "Wells shows how biology textbooks distort the scientific evidence to promote Darwinian evolution and the naturalistic philosophy that underlies it. . . .  Some of these icons of evolution present assumptions or hypotheses as though they were observed facts.  Other icons conceal raging controversies among biologists that have far-reaching implications for evolutionary theory. Worst of all, some are directly contrary to well-established scientific evidence."   Access Research Network, http://www.arn.org/arnproducts/vidinfo.htm (last visited Jan. 9, 2006).   Jonathan Wells, a theologian with the Rev. Sun Myung Moon's Unification Church, was chosen by Rev. Moon to enter a Ph.D. program in biology so that he could carry out Moon's mission to "devote [his] life to destroying Darwinism." BARBARA FORREST & PAUL R. GROSS, CREATIONISM'S TROJAN HORSE 85 (2005); Jonathan Wells, *Darwinism: Why I Went for a Second Ph.D.*, THE WORDS OF THE WELLS FAMILY, http://www.tparents.org/Library/Unification/Talks/Wells/DARWIN.htm. (Rev. Moon has been an ardent critic of evolutionary theory because of his belief that evolution leaves "no room for God's involvement in nature or history.   *See id.*; Jerry A. Coyne, *Creationism by Stealth*, NATURE (2001), *available at* http://www.stephenjaygould.org/ctrl/archive/design/coyne_stealth.html).

8.      *"Focus on Origins: A Panel Discussion on the Theory of Evolution"*

According to the Access Research Network, which produces this video, "Ruse, Tiffney, and Wells bring their collective intellect, expertise, disagreements and humor to bear on three important themes in the origins debate: the nature, aims and limitations of science; the contemporary status of evolution as a scientific theory; [and] the political dimensions of

contemporary discussion and debates of evolution in American education." Access Research Network, http://www.arn.org/arnproducts/vidinfo.htm (last visited Jan. 9, 2006).

*9.      "On the Origins of Phyla: Interview with James W. Valentine"*

According to the Access Research Network, which produces this video, "[w]idely recognized as one of the world's leading authorities on invertebrate paleontology and evolutionary paleobiology, Professor James Valentine's research tackles what many consider the most difficult and enigmatic problem facing neo-Darwinian theory: explaining the origin of phyla." Access Research Network, http://www.arn.org/arnproducts/vidinfo.htm (last visited Jan. 9, 2006).

*10.      "2001 Darwin, Design & Democracy Conference with Jonathan Wells"*

This conference was sponsored by the Intelligent Design Network, and focuses on a well-known proponent of intelligent design.    Intelligent Design Network, http://www.intelligentdesignnetwork.org (last visited Jan. 9, 2006).

*11.      "The Triumph of Design and the Demise of Darwin, featuring Phillip Johnson"*

According to the Intelligent Design Network, which sells this video online, it "clearly and dramatically shows the gaping holes in Darwinian theory and the mounting evidence for the intelligent design of the universe."    Intelligent Design Network, http://www.intelligentdesignnetwork.org (last visited Jan. 9, 2006).

At the January 1 Board of Trustees meeting, Frazier Mountain High School science teachers Tim Garcia and Jim Selgrath and math teacher Jim Atkinson voiced their objections to the Philosophy of Design class, which they believe undermines the school's science curriculum. Ex. 1, ¶ 38.  The class was nonetheless approved by the Board on a 3-2 vote (with Trustees Throckmorton and Nelson voting against it).  [need cite]  The class commenced on January 3.

On January 4, Americans United for Separation of Church and State sent defendants a letter stating that the class is unconstitutional and asking that it be cancelled.  Ex. 3, Att. A. On January 6, 2005, Americans United received a written response from Superintendent Wight stating that the District intends to proceed with the class.  Ex. 3, Att. B.

**E.      The Concepts at Issue**

Creationism posits that God created the universe essentially as we see it today, and that the universe has not changed appreciably since that creation event.  *See* Ex. 4, ¶ 21.  There are two

types of creationists, young-earth creationists and progressive creationists. *See id.* at ¶ 22-24. Young-earth creationists believe that the universe is roughly 10,000 years old, while progressive creationists accept the scientific evidence that the Earth is billions of years old, but believe that God engaged in multiple acts of special creation throughout the Earth's history. *See id.* at ¶ 22-24. Intelligent design is a form of creationism, and specifically a subset of creation science. *See id.* at ¶25.

Intelligent-design proponents believe that God (or, as they put it, "an intelligent agent" with powers greater than any known material agent) specially creates "irreducibly complex" biological structures or processes. The claim is that such complex structures and processes are unexplainable through natural cause, and therefore that, by default, God must have created them specially. The majority of intelligent-design creationists are progressive creationists, though some are young-earth creationists. *See id.*

<strong>ARGUMENT</strong>

**I.    The Plaintiffs Have Standing**

The plaintiffs are taxpayers as well as parents of students at Frazier Mountain High School. *See* Ex. 1 (Hurst Decl.). They have standing, in both of these capacities, to maintain their challenge to the Philosophy of Design course.[4] *See Gibson v. Lee County Sch. Bd.*, 1 F. Supp. 2d 1426, 1431 (M.D. Fla. 1998); *Herdahl v. Pontotoc County Sch. Dist.*, No. 3:94-188, 1996 WL 33373360, at \*5 (N.D. Miss. Feb. 22, 1996); *Crockett v. Sorenson*, 568 F. Supp. 1422, 1424-25 (C.D. Va. 1983); *Wiley v. Franklin*, 468 F. Supp. 133, 146-47 (E.D. Tenn. 1979).

---

[4]    In California, public schools are funded by a combination of local property taxes and state funds. *See Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 251-52 (9th Cir. 1992); EdSource Online, http://www.edsource.org/edu_fin.cfm#where (last visited Jan. 9, 2006). Upon information and belief, Mrs. Lemburg is paid with public funds to perform her duties, including the teaching of the Philosophy of Design course. Furthermore, also upon information and belief, the course materials (including the videos) have been or are being purchased with public funds.

## II.    The Standards for Issuing Preliminary Relief

The Ninth Circuit employs two sets of criteria for granting preliminary relief.[5] *Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1120 (9th Cir. 2005). The "traditional" test calls for relief to issue when the plaintiff demonstrates "'(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases).'" *Id.* (quoting *Johnson v. Cal. State Bd. of Accountancy,* 72 F.3d 1427, 1430 (9th Cir.1995)). The balancing test calls for relief to issue if the plaintiff "demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in [the plaintiff's] favor." *Id.* (quoting *Johnson*, 72 F.3d at 1430) (emphasis in original).

These tests are not deemed inconsistent, as the four-part test can essentially be reduced to two factors: "The likelihood of the plaintiff's success on the merits; and, the relative balance of potential hardships to the plaintiff, defendant, and public." *Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1389 (9th Cir. 1988). The tests thus create a single continuum: "The critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly towards the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Id.* These are "'two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests but rather outer reaches of a single continuum.'" *Id.* (quoting *Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1100 (9th Cir.1998)). *See also S.W. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (two tests

---

[5]    Generally, the standards for granting a temporary restraining order and a preliminary injunction are the same. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that, because the "analysis is substantially identical" for a temporary restraining order and a preliminary injunction, the court only reviewed the injunction); *L.A. Unified Sch. Dist. v. U.S. Dist. Ct.* 650 F.2d 1004, 1008 (9th Cir. 1981) (Ferguson, J. dissenting) (explaining that because temporary restraining orders usually cannot be appealed, "guidance [on temporary restraining orders] may be gleaned from cases considering the propriety of preliminary injunctions"); *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1247 (D. Haw. 1999) ("The standards for granting a temporary restraining order and a preliminary injunction are identical."), *aff'd sub nom. Hawaii v. Gannett Pac. Corp.*, 203 F.3d 832 (9th Cir. 1999) (table).

create "a continuum:  the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor").  "Because the test . . . is 'a continuum in which the required showing of harm varies inversely with the required showing of meritoriousness,' when the harm claimed is a serious infringement on [First Amendment rights], a plaintiff is entitled to an injunction even on a lesser showing of meritoriousness." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 972-73 (9th Cir. 2002) (quoting *San Diego Comm. v. Governing Bd.*, 790 F.2d 1471, 1473 n.3 (9th Cir. 1986)).

While the substance of the standard does not change for injunctions that alter, rather than maintain, the status quo, the scrutiny that is due is heightened in the former context:  Such an injunction should not be issued unless the facts and law clearly favor the moving party." *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).  That is, the pertinent factors must "weigh heavily and compellingly in movant's favor before such an injunction may be issued." *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir.1991)).

Here, the pertinent factors weigh heavily and compellingly in the plaintiffs' favor.[6]  Indeed, the only question that merits any consideration under either the traditional or balancing test is the plaintiffs' likelihood of success, because the remaining factors of both tests are easily satisfied: (1) the infringement of plaintiffs' constitutional rights plainly constitutes irreparable harm (*see Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")); (2) the balance of hardships favors the plaintiffs in a case such as this (*see Gibson v. Lee County Sch. Bd.*, 1 F. Supp. 2d 1426, 1435 (M.D. Fla. 1998) (granting preliminary injunction against portion of Bible Study course that was not being taught in secular, objective manner, and finding that "harm to Plaintiffs

---

[6]      Plaintiffs request that the court waive the security requirement of Federal Rule of Civil Procedure 65(c) for this public-interest litigation. *See Friends of the Earth v. Brinegar*, 518 F.2d 322, 322-23 (9th Cir. 1975) (holding that district court did not err in waiving security bond for a "non-profit environmental organization"); *City of South Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1148 (C.D.Cal. 1999) (citing *California. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985) (stating that "[c]ourts routinely impose either no bond or a minimal bond in public interest environmental cases"); *Pollar v. Judson Steel Corp.*, No. 82-6833, 1984 WL 968, *4 (N.D.Cal. Mar. 30, 1984) (setting bond requirement at $1.00 "[b]ecause of the public interest involved in this litigation and the lack of any potential prejudice to defendants").

in infringement of First Amendment rights outweighs any expenditure of time and money by Defendants"); *Doe v. Human*, 725 F. Supp. 1499, 1502 (W.D. Ark. 1989) (granting preliminary injunction against Bible Study course that relied on materials that presented Bible as literal truth, and finding that harm to plaintiffs outweighed school's interest in running its affairs without court intervention)); and (3) the public interest calls for granting emergency relief because "[i]t is an abuse of public trust when elected officials ignore established legal standards" (*Gibson*, 1 F. Supp. 2d at 1435; *see also Human*, 725 F. Supp. at 1502).

**III.    It Is Virtually Certain That the Plaintiffs Will Succeed in Establishing That the "Philosophy of Design" Course Is Unconstitutional.**

For plaintiffs to be entitled to an injunction, they need not show certainty of success; they need only establish that they are likely to succeed on the merits of their claim. *See, e.g.*, *Save Our Sonoran, Inc.*, 408 F.3d at 1120. But here plaintiffs can do much more: Under clearly established law, the school district's decision to offer a course that advocates a religious view of the origins of life, while casting doubt on evolution, constitutes a patent violation of the Establishment Clause.

**A.    The Establishment Clause Standards**

Governmental action will be found to violate the Establishment Clause if it was undertaken with a primarily religious purpose (*McCreary County v. ACLU of Kentucky*, 125 S. Ct. 2722, 2733 (2005)) or if it has a primarily religious effect (*see County of Allegheny v. ACLU*, 492 U.S. 573, 592 (1989)). The Supreme Court has refined this inquiry to ask whether, from the standpoint of a reasonable, objective observer, the government has taken action with the aim or result of endorsing specific religious beliefs or religion in general. *See, e.g.*, *County of Allegheny*, 492 U.S. at 593-94; *Mellen v. Bunting*, 327 F.3d 355, 370 (4th Cir. 2003), *cert. denied*, 541 U.S. 1019 (2004). Official endorsement of religion violates the Establishment Clause because it sends a message to "nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2000) (internal quotation marks and citation omitted).

The reasonable, objective observer is "presumed to be familiar with the history of the government's actions and competent to learn what history has to show." *McCreary*, 125 S. Ct. at

2736-37; *see also Santa Fe*, 530 U.S. at 308 (objective observer presumed to be familiar with "implementation of" governmental action); *Kitzmiller*, 2005 WL 3465563, at *6 (endorsement test "consists of the reviewing court determining what message a challenged governmental policy or enactment conveys to a reasonable, objective observer who knows the policy's language, origins, and legislative history, as well as the history of the community and the broader social and historical context in which the policy arose").

Because students in public schools "are impressionable and their attendance is involuntary" (*Edwards*, 482 U.S. at 584), courts must be "particularly vigilant in monitoring compliance with the Establishment Clause" in the public-school context. *Id.* at 583-84; *see also Sch. Dist. v. Ball*, 473 U.S. 373, 390 (1985) ("The inquiry into this kind of effect must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years."), *overruled in part on other grounds*, *Agostini v. Felton*, 521 U.S. 203 (1997); *Selman v. Cobb County Sch. Dist.*, 390 F. Supp. 2d 1286, 1306 (N.D. Ga. 2005).

Accordingly, when deciding whether a public school's conduct conveys an unconstitutional message of endorsement, courts employ an objective-*student* standard, in order "to ensure that courts exercise the particular vigilance that the Supreme Court has mandated for protecting impressionable children from religious messages that appear to carry official imprimatur." *Kitzmiller*, 2005 WL 3465563 at *15; *see Selman*, 390 F. Supp. 2d at 1311 (textbook sticker stating that evolution was theory was particularly likely to convey message of endorsement "given the Sticker's intended audience, impressionable school students"); *Joki v. Bd. of Educ.*, 745 F. Supp. 823, 831 (N.D.N.Y. 1990) ("To an impressionable student, even the mere appearance of secular involvement in religious activities might indicate that the state has placed its imprimatur on a particular religious creed."); *see also Doe v. Porter*, 370 F.3d 558, 563 (6th Cir. 2004) ("Because [Bible course] is conducted in public school classrooms, during school hours, and for children who are as young as kindergarten age, we must treat the objective observers as students in these classes.").

**B.      Efforts to Undermine Evolution or Advance Religious Theories About the Origins of Life Run Afoul of the Establishment Clause.**

The Supreme Court has held that both undermining the teaching of evolution and advancing the tenets of creationism or its progeny reflect plainly religious purposes.  In *Epperson v. Arkansas*, 393 U.S. 97 (1968), the Supreme Court struck down a state statute prohibiting the teaching of evolution in public schools.  The Court held that "the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma."  *Id.* at 106.  As the Court explained, the Establishment Clause "forbids alike the preference of a religious doctrine or the prohibition of theory which is deemed antagonistic to a particular dogma."  *Id.* at 106-07.

Subsequently, in *Edwards*, the Supreme Court invalidated a state statute requiring the "balanced treatment" of evolution and "creation science" in the public schools.  482 U.S. at 581.  The Court declared the law unconstitutional because its "preeminent purpose . . . was clearly to advance the religious viewpoint that a supernatural being created humankind."  *Id.* at 591.  The Court deemed the Act's stated purpose of protecting academic freedom to be a sham because the Act did not, in fact, advance this purpose.  *See id.* at 586-87.

Other courts have similarly struck down public schools' attempts to teach thinly disguised religious theories regarding the origins of life.  *See Peloza v. Capistrano Unified Sch. Dist*., 37 F.3d 517, 522 (9th Cir. 1994) (holding that a science teacher was properly forbidden from teaching nonevolutionary views of creation); *Webster v. New Lenox Sch. Dist. No. 122*, 917 F.2d 1004, 1008 (7th Cir. 1990) (stating that, by forbidding teaching of creation science in social-studies class, a school "successfully navigated the narrow channel between impairing intellectual inquiry and propagating a religious creed"); *Daniel v. Waters*, 515 F.2d 485, 491 (6th Cir. 1975) (striking down statute that required schools teaching evolution to devote equal time to other theories, including Biblical account of creation); *McLean*, 529 F. Supp. at 1258-66 (holding that teaching creation science in public schools is unconstitutional because it advances religion); *cf. Freiler v. Tangipahoa Parish Bd. of Educ*., 185 F.3d 337, 348 (5th Cir. 1999) (striking down a disclaimer stating that evolution was merely a theory); *Selman,* 390 F. Supp. 2d at 1311 (same).

These legal principles were recently reaffirmed in *Kitzmiller*, in which the court struck down — as violative of both the purpose and effect prongs of the Establishment Clause test — a school board's decision to introduce intelligent design into the science curriculum. After reviewing the extensive evidence submitted during a six-week trial, the judge concluded that "[intelligent design] is nothing less than the progeny of creationism." *Id.* at *12. The court thus held that presenting intelligent design — alongside, and as an alternative to, the theory of evolution — is tantamount to advancing religion. *Id.* at *53.

These decisions bar public schools from seeking to debunk evolution for religious ends or from teaching that religious theories on the origins of life compete with the scientific theory of evolution. Frazier Mountain's "Philosophy of Design" course does both. It is clear that Mrs. Lemburg's purpose in teaching the course is to undermine evolution and to promote a religious perspective in its stead. It is equally clear that a reasonable observer would understand this to be the effect of the course.

**C.    The "Philosophy of Design" Course Is Designed to Serve a Primarily Religious Purpose.**

The course description, syllabi, and materials to be used in the class demonstrate that the "Philosophy of Design" course is designed not to serve the school district's purported purpose of promoting critical thinking,[7] but rather to advance a religious theory of the origins of life. This is manifest from the original course description, which was distributed to students and their families on December 1 and has never been revised:

> The class will take a close look at evolution as a theory and will discuss the scientific, biological, and Biblical aspects that suggest why Darwin's philosophy is not rock solid. . . .  Topics that will be covered are the age of the earth, a world wide flood, dinosaurs, pre-human fossils, dating methods, DNA, radioisotopies, and geological evidence.  Physical and chemical evidence will be presented suggesting the earth is thousands of years old, not billions.

*See* Ex. 1, Att. A. This course description makes clear that Mrs. Lemburg seeks through the class to cast doubt on evolution and to advocate in its stead for a plainly religious view. *See* Ex. 4, ¶ 80.

---

[7]    Superintendent Wight has said, both in the press and in his response to the plaintiffs' demand letter, that the course is designed to foster critical thinking. *See* Lisa Schencker, *Origins of life course gets OK*, THE BAKERSFIELD CALIFORNIAN, Dec. 22, 3005, at A1 (quoting Wight as saying that the "Philosophy of Design" course is "not about what's right or wrong.  It's a critical thinking class."); Ex 3, Att. B.

Mrs. Lemburg's bias is further reflected in the questions that the syllabus poses with respect to intelligent design, namely "Why is it gaining momentum?" and "Why is it so threatening to society?" *See* Ex. 1, Att. B. The revised syllabus modifies these questions slightly, but does not remove the course's systematic bias. *See* Ex. 1, Att. C.

Similarly revealing of Mrs. Lemburg's bias is the original syllabus' inclusion of lesson plans on the "Laws of Thermodynamics" and "Fossil Records and Dating Methods." *See* Ex. 1, Att. B. Singling out these topics for course treatment reflects a plainly creationist agenda, as these topics are the very ones that proponents of creationism claim demonstrate the fallacies of evolutionary theory. *See* Ex. 4, ¶ 83.

And if there were any remaining doubt, Mrs. Lemburg's bias is confirmed by the video lists attached to her course syllabi. In the original syllabus, twenty-three of the twenty-four videos advocated creationist views. The revised syllabus is similarly dominated by such videos: All but one — a PBS series on evolution — is produced by a pro-intelligent design or pro-creationist organization. Ex. 4, ¶¶ 81, 86. Mrs. Lemburg's pro-creationism, anti-evolution bias is further reflected in the fact that she has selected numerous videos presenting purported gaps/problems in the scientific theory of biological evolution but no videos presenting gaps in, or problems with, intelligent-design and young-earth creationism. Ex. 4, ¶ 87.

**D.    The Primary Effect of the "Philosophy of Design" Course Is to Promote Religion.**

**1.    The Reasonable Observer Would View the Course As Promoting Religious Theories on the Origins of Life.**

The reasonable, objective observer — familiar with the development of the course, including the course description and syllabi, as well as the broader social and historical context in which the course arose — would view the Philosophy of Design course as a strong official endorsement of religion. From an objective student's perspective, the course is designed to "protect and maintain a particular religious viewpoint" (*Freiler*, 185 F.3d at 346) by disparaging the scientific theory historically thought to rival that viewpoint, and by encouraging students to study and reflect on inherently religious beliefs.

An objective student "is presumed to have information concerning the history of religious opposition to evolution." *Kitzmiller*, 2005 WL 3465563, at *19. Accordingly, an objective student

would recognize from the plain language of the course description that the goal of the course is to promote a Christian view of the origins of life. *See Kitzmiller*, 2005 WL 3465563, at *20-21. The objective student would understand the course description's statement that the class "will discuss the scientific, biological, and Biblical aspects that suggest why Darwin's philosophy is not rock solid" to be a religiously motivated attack on evolution. And an objective student would recognize the statement in the course description that "the earth is thousands of years old, not billions," to be a creationist belief, and would therefore view the course's attempt to present "[p]hysical and chemical evidence" to support that belief as a promotion of religion. *See* Ex. 4, ¶¶22, 80.

An objective student would also have knowledge of the course syllabi. That student would recognize that two of the topics on the original syllabus — "Laws of Thermodynamics" and "Fossil Records and Dating Methods" — are subjects that creationists frequently seize upon — and misrepresent — to argue that the theory of evolution is erroneous. *See* Ex. 4, ¶ 83. And the objective student would know that all, or virtually all, of the videos listed on the syllabi are produced by advocates of creationism or intelligent design and promote religious theories of the origin of life. Ex. 4, ¶¶ 81, 86.

### 2. This Conclusion Does Not Change By the Expedient of Denominating the Course as Teaching "Philosophy" Rather than "Science."

That the course is not denominated a "science" course, but is instead touted as a "philosophy" course that will give "equal time" to both "philosophies," is of no moment.[8] The Constitution bars governmental endorsement of religion in *any* context. Thus, in *Edwards*, the statute struck down by the Supreme Court required public schools to give "balanced treatment" to creationism and evolution in lectures, textbooks, and library materials not just "for the sciences" but also "for the humanities." *See* 482 U.S. at 598 (Powell, J., concurring) (emphasis added). Similarly, in *Webster*, the Seventh Circuit held that the Establishment Clause obligated a school district to prohibit a teacher from injecting creationist views into a discussion of the age of the earth in a *social studies* class. *Webster*, 917 F.2d at 1006, 1008. Indeed, presenting evolution as

---

[8]     The revised syllabus states that "Equal time will be given to each idea or philosophy" and that "Equal and balanced instruction will be given on all philosophies." *See* Ex. 1, Att. C. But as the court in *Kitzmiller* recently found, evolution is not a "philosophy" that stands on the same footing as "Intelligent Design" and "Creationism"; suggesting that evolution  is a "philosophy"  misrepresents science and manifests a plainly religious agenda. *Cf. Kitzmiller*, 2005 WL 3465563, at *32-33.

a "philosophy" only compounds the constitutional infirmity, because it misleads students into thinking that the scientific theory of evolution is a "belief" or "viewpoint," in competition with other beliefs and viewpoints, including religious ones. *See Kitzmiller*, 2005 WL 3465563, at *19; *see also* Ex. 4, ¶¶ 89-96.

Thus, the operative inquiry is not the label that is assigned to the class, but the subject matter that the course covers — and the subject matter in this instance includes scientific material (*see, e.g.*, *Kitzmiller*, 2005 WL 3465563, at *32); and the videos on which Mrs. Lemburg intends to rely purport to be scientific ones. For example, Illustra Media, the producer of "Unlocking the Mysteries of Life," states that the video "transports you into the interior of the living cell to explore systems and machines that bear the unmistakable hallmarks of design." Illustra Media, http://www.illustramedia.com/umolinfo.htm (last visited Jan. 9, 2006). And the description provided by Answers in Genesis for its video "Chemicals to Living Cell" states that "[g]oo-to-you" evolution is impossible" because "[t]he laws of real chemistry prevent non-living chemicals from arranging themselves into living cells." Answers in Genesis, http://www.answersingenesis.org (last visited Jan. 9, 2006).

To be sure, schools can teach students *about* religious beliefs. *See, e.g.*, *School Dist. of Abington v. Schempp*, 374 U.S. 203, 225 (1963) (noting that the Bible "is worthy of study for its literary and historic qualities"). Indeed, the list of classes offered at Frazier Mountain High School during intersession includes a comparative-religions course — a topic that is an entirely lawful one for public schools so long as it does not devolve into religious advocacy or proselytization. *See* Ex. 1, Att. A. Furthermore, a school could, in the context of a philosophy, social-studies, or other humanities course, teach about the cultural, social, or legal controversy surrounding the teaching of evolution. And a school could elect to inform students of the "scientific critiques of prevailing scientific theories," including evolution. *Edwards*, 482 U.S. at 593. But as with Bible-study courses, such teaching would have to be "presented objectively as part of a secular program of education." *Abington*, 374 U.S. at 225.

Courts have interpreted this objectivity requirement to mean that schools may teach about religious beliefs only if they do so from a pedagogically critical perspective and without reliance on materials that advocate a religious viewpoint. *See, e.g.*, *Doe v. Porter*, 370 F.3d 558 (6th Cir.

2004) (striking down Bible class presenting Bible as truth); *Hall v. Bd. of Sch. Comm'rs*, 656 F.2d 999 (5th Cir. 1981) (striking down Bible-study class employing course materials written from Christian perspective); *Gibson v. Lee County Sch. Bd.*, 1 F. Supp. 2d 1426 (M.D.Fla. 1998) (enjoining school district from using Bible-class curriculum that presented New Testament as true); *Herdahl v. Pontotoc County Sch. Dist.*, 933 F. Supp. 582 (N.D. Miss. 1996) (striking down Bible-study course that was intended to impart Christian religious doctrine, that employed specific version of Bible, and that endorsed biblical point of view); *Doe v. Human*, 725 F. Supp. at 1503 (striking down Bible-study course that used texts depicting biblical events as fact and failed to offer critical perspective), *aff'd mem.*, 923 F.2d 857 (8th Cir. 1990); *Wiley v. Franklin*, 468 F. Supp. 133 (E.D. Tenn. 1979) (striking down Bible-study course that failed to include biblical criticism and did not provide diversity of biblical interpretations).

Here, the course description and syllabi make plain that the challenged course is not being taught from an objective perspective, and that the teaching relies extensively on materials that are similarly biased. Moreover, Mrs. Lemburg has no scientific training and she is thus unable to offer a critical analysis of the contents of the videos that she shows. To make matters worse, she has been unable to find any guest speakers "in support of evolution." *See* Ex. 1, Att. C. Thus, students will be asked to view "infomercial" videos[9] that purport to make the case that science supports the creationist or intelligent-design perspective, and that evolutionary theory is scientifically misguided — and no one will be able to place these arguments in an objective light. Under these circumstances, it is simply untenable to claim that the course is being presented in an objection manner, or that it will have the effect of promoting critical thinking.

**IV.    In the Event That the Court Elects to Conduct a Hearing, the Plaintiffs Seek Leave to Take Three Essential Depositions.**

In light of the plaintiffs' satisfaction of the standards for the issuance of a temporary restraining order, the plaintiffs respectfully request the issuance of an injunction that requires the defendants to cease offering the Philosophy of Design course immediately. To the extent that the

[9]    After a New Mexico public television station refused to air "Unlocking the Mysteries of Life" once it learned that funding for the video had come from evangelical Christian groups, the Intelligent Design Network Inc. paid a local NBC affiliate to broadcast the video as an hour-long infomercial. Rick Nathanson, *Evolution Film to Be Aired*, ALBUQUERQUE J., May 7, 2005, at E2; *see also* Rick Nathanson, *KNME Shelves Christian-Funded Show*, ALBUQUERQUE J., Jan. 7, 2005, at A1.

Court, in addition to or instead of granting a temporary restraining order, wishes to hold a hearing and take evidence in conjunction with the potential issuance of a preliminary injunction, the plaintiffs seek leave of Court to take the depositions of the persons most central to the offering of this course: Sharon Lemburg (the teacher and driving force behind this class), Dan Penner (the Principal of Frazier Mountain High School), and John Wight (the Superintendent of El Tejon Unified School District and the person charged, in his own words, with "monitoring classroom instruction" (*see* Ex. 3, Att. B)).

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court issue the following relief forthwith:

(1) A temporary restraining order, followed by a preliminary injunction as necessary,[10] that prohibits the defendants from continuing with the Philosophy of Design course; and

(2) In the event that the Court elects to take evidence at a preliminary-injunction hearing, plaintiffs seek leave of Court to take the depositions of Sharon Lemburg, Dan Penner, and John Wight in advance of that hearing.

---

[10/] According to the website of the El Tejon Unified School District, the intersession period is scheduled to continue through February 3, 2006. *See* Compl. at ¶ 1. However, the letter sent by Superintendent John Wight to plaintiffs' counsel Ayesha Khan states that the course will terminate on January 20, 2006. *See* Ex. 3, Att. B. Federal Rule of Civil Procedure 65(b) contemplates that a TRO can last up to 10 days. If the Court were to issue the TRO on the date that the Complaint was filed (January 10, 2006), and the course does indeed terminate on January 20, 2006, the injunction would cover the entire time period in question. If, however, the course extends beyond January 20, 2006, either an extension of the TRO, or a preliminary injunction, would become necessary.

Mem. Supp. Pls.' Mot. for TRO

Respectfully submitted,

By: ___/s/ John Danos_____

Ayesha N. Khan

Richard B. Katskee

Sara J. Rose

(motions for admission *pro hac vice* pending)

Heather L. Weaver

(motion for admission to the Bar of this court pending)

AMERICANS UNITED FOR SEPARATION OF
    CHURCH AND STATE

518 C St., NE

Washington, DC  20002

Tel.:    (202) 466-3234

Fax:    (202) 466-2587

*akhan@au.org / katskee@au.org /*
*rose@au.org / weaver@au.org*

Maurice A. Leiter (Bar. No. 123732)

John Danos (Bar No. 210964)

ARNOLD & PORTER LLP

777 S. Figueroa St., 44th Floor

Los Angeles, CA 90017

Tel:    (213) 243-4000

Fax:    (213) 243-4199

*Maury_Leiter@aporter.com /*
*John_Danos@aporter.com*

Counsel for Plaintiffs Kenneth Hurst, Joan Balcome, Kirk Roger Tingblad, Phillip Jones-Thomas, Barry S. Goldberg, Sophie Goldberg, Jeannie Parent, Ken and Jody Valmassy, and Ann and Richard Howard

Date:    January 10, 2006